**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **MABEL ESTANISLADA ALVAREZ BENEDICKS AND ROSSEL DONEY REYES MARTINEZ,** ON THEIR OWN BEHALF, AS HEIRS, AND AS LEGAL REPRESENTATIVES OF THE ESTATE OF ANADITH DANAY REYES ALVAREZ**,** | § § § § § § § § | **CIVIL ACTION NO. 1:26-cv-2966** |
| **Plaintiffs,** | § § | **FIRST AMENDED COMPLAINT** |
| **v.** | § § § | **JURY DEMANDED AS TO STATE TORT CLAIMS AGAINST THIRD-PARTY DEFENDANT LSGS** |
| **UNITED STATES OF AMERICA; LOYAL SOURCE GOVERNMENT SERVICES, LLC,** | § § § | |
| **Defendants.** | | |

Plaintiffs Mabel Estanislada Alvarez Benedicks and Rossel Doney Reyes Martinez ("Plaintiffs"), on their own behalf, as beneficiaries and heirs of their daughter, Anadith Danay Reyes Alvarez, and as Legal Representatives of her Estate, bring this action against the United States of America ("United States") and third-party defendant Loyal Source Government Services, LLC, ("LSGS"), and hereby allege as follows:

## PRELIMINARY STATEMENT

1. On May 17, 2023, Anadith Danay Reyes Alvarez, an eight-year-old girl, died in the custody of U.S. Customs and Border Protection ("CBP"). LSGS served as CBP's contracted medical provider in detention centers along the border where Anadith was detained.

2. Anadith had sickle cell disease and a heart condition, which made her vulnerable to serious illness and death from infection. When CBP took her into custody in Texas, her conditions were well managed, and she was healthy. When taken into CBP custody, Anadith's parents informed CBP officials and LSGS personnel that Anadith had these conditions and needed special medical care.

3. Approximately four days after CBP took Anadith and her parents into custody, Anadith began to feel ill and tested positive for influenza.

4. Over the next several days, Anadith's condition continued to deteriorate. She suffered a fever of 104.9 degrees Fahrenheit and complained of abdominal pain, nausea, breathing difficulties, bone pain, and chest pain.

5. On multiple occasions, Anadith's mother, Ms. Alvarez Benedicks, begged CBP and LSGS officials to transfer Anadith to a hospital because of her rapid deterioration and high risk of serious illness or death. Anadith herself also pleaded for help.

6. CBP and LSGS disregarded Ms. Alvarez Benedicks's and Anadith's repeated pleas.

7. Without access to adequate emergency medical care in CBP custody, Anadith's health continued to decline until she could no longer breathe. On May 17, 2023, Anadith died in her mother's arms.

8. Anadith's death while in CBP custody and under LSGS's care was entirely preventable. CBP's and LSGS's gross negligence directly caused her death. The facts in her case and the findings of several official public reports confirm CBP's and LSGS's gross negligence.

9. Plaintiffs, who are Anadith's parents, bring this action on behalf of Anadith's Estate and themselves individually for damages and for the extreme mental and emotional pain and distress, as well as loss of companionship, support, and enjoyment of life, caused by Anadith's tragic death.

## JURISDICTION AND VENUE

10. The United States District Court for the Southern District of New York has original jurisdiction over Plaintiffs' claims against the United States pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346(b)(1) (federal defendant). The Court has supplemental jurisdiction over the state law claims against third-party Defendant LSGS under 28 U.S.C. § 1367.

11. The United States District Court for the Southern District of New York is a proper venue for Plaintiffs' claims against the United States pursuant to 28 U.S.C. § 1402(b) because Plaintiffs reside in the district.

12. This Court also has jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity), as all parties are citizens of different states. LSGS is a citizen of Florida. In their individual capacities, Plaintiffs are citizens of Honduras. As representatives of Anadith's estate, Plaintiffs are citizens of Panamá, where Anadith was born.

13. The Southern District of New York is a proper venue for the United States's claims against LSGS pursuant to 28 U.S.C. §§ 1391 and 1402(b).[1] Because LSGS is properly a third-party defendant in this action brought in this district, venue is also appropriate for Plaintiffs' claims against LSGS. *See, e.g.*, *Thompson v. United Artists Theatre Circuit, Inc.*, 43 F.R.D. 339, 341 (S.D.N.Y. 1967); *Agrashell, Inc. v. Bernard Sirotta Co.*, 344 F.2d 583, 585 (2d Cir. 1965).

**<u>FTCA EXHAUSTION FOR CLAIMS AGAINST DEFENDANT UNITED STATES OF AMERICA</u>**

14. The FTCA has an exhaustion requirement under which a claimant, before filing suit, must tender an administrative tort claim to the relevant federal

[1] The United States agrees. *See* United States's Third-Party Complaint Against LSGS, Dkt. 39, at ¶ 7 ("The Southern District of New York is proper venue for the United States's claims against LSGS pursuant to 28 U.S.C. §§ 1391 and 1402(b). Because Plaintiffs' claims are properly brought in this district, venue is also appropriate for this third-party action.").

agency. 28 U.S.C. § 2675(a). Plaintiffs have exhausted all available administrative remedies against the United States government.

15. On May 1, 2025, Plaintiffs submitted through counsel an administrative claim on FTCA Standard Form 95 to CBP and the U.S. Department of Homeland Security ("DHS").

16. On May 6, 2025, DHS and CBP sent Plaintiffs a letter acknowledging receipt of the administrative claim.

17. DHS and CBP gave notice of the final denial of the claim by certified mail on October 14, 2025.

## PARTIES

18. Mabel Estanislada Alvarez Benedicks is Anadith's mother. She is a citizen of Honduras, but currently resides in Bronx, New York. Ms. Alvarez Benedicks sues in her individual capacity as mother and heir, in her capacity as a wrongful death beneficiary, and in her capacity as a legal representative of the Estate of Anadith Danay Reyes Alvarez. *See* TEX. CIV. PRAC. & REM. CODE §§ 71.004 (wrongful death statute), 71.021 (survivorship statute).

19. Rossel Doney Reyes Martinez is Anadith's father. He is a citizen of Honduras, but currently resides in Bronx, New York. Mr. Reyes Martinez sues in his individual capacity as father and heir, in his capacity as a wrongful death beneficiary, and in his capacity as a legal representative of the Estate of Anadith

Danay Reyes Alvarez. *See* TEX. CIV. PRAC. & REM. CODE §§ 71.004 (wrongful death statute), 71.021 (survivorship statute).

20. Anadith Danay Reyes Alvarez, a citizen of Panamá, was eight years old when she died in custody of the United States. She is survived by her parents, Ms. Alvarez Benedicks and Mr. Reyes Martinez, and two minor siblings. Ms. Alvarez Benedicks and Mr. Reyes Martinez are the rightful heirs to Anadith's Estate and have executed a Family Settlement Agreement. *See* TEX. EST. CODE § 201.001(c); *Shepherd v. Ledford*, 962 S.W.2d 28, 32 (Tex. 1998) ("A family settlement agreement is an alternative method of administration in Texas that is a favorite of the law."). The Family Settlement Agreement has designated Ms. Alvarez Benedicks and Mr. Reyes Martinez as the legal representatives of the Estate of Anadith Danay Reyes Alvarez. The Estate has no property or debts, and thus, no administration of the Estate is necessary. *See* TEX. ESTATES CODE 306.002(b), (c). Additionally, no administration is pending.

21. Under the FTCA, 28 U.S.C. § 2671, the United States is the proper defendant to answer for the acts of "federal agencies" and their employees, officers, and agents. Such agencies include, without limitation, DHS and its component agencies, U.S. Immigration and Customs Enforcement ("ICE") and CBP; and the U.S. Department of Justice ("DOJ") and its component agencies. At all relevant times, federal officers and employees referenced in this Complaint were employees

of the United States working within the scope and course of their employment. At the time of Anadith's detention, at CBP's Donna Processing Center, and at the Harlingen Border Patrol Station, these employees were responsible for Anadith's well-being and healthcare.

22. Loyal Source Government Services ("LSGS") is a limited liability corporation headquartered in Orlando, Florida. Upon information and belief, all members of LSGS are domiciled in Florida. LSGS provides services to government agencies and private businesses, such as healthcare staffing, technical services, engineering, and travel healthcare. LSGS contracted with CBP to provide medical services for noncitizens in CBP custody at CBP detention centers along the southwestern Texas-Mexico border beginning in 2015, including at the Donna Central Processing Center in Donna, Texas, and the U.S. Border Patrol Station in Harlingen, Texas.

## STATEMENT OF FACTS

### A. Anadith had sickle cell disease and other heart-related medical conditions that were well-managed prior to her arrival in the United States.

23. Anadith was a happy, playful eight-year-old girl. She was the youngest of three children and loved spending time with her two older siblings. She dreamed of becoming a doctor when she grew up.

24. Anadith's family identifies as Garifuna, an Afro-Indigenous group from Honduras that has long faced discrimination and persecution in Honduras. Anadith was born in Panamá, where her family had sought temporary refuge.

25. Anadith's family immigrated to the United States looking for a better life and opportunities free from persecution.

26. Before arriving in the United States, Anadith was diagnosed with sickle cell disease (also called sickle cell anemia) and a heart murmur caused by sub-valvular aortic stenosis, a congenital heart defect. When she was five years old, Anadith underwent successful heart surgery to repair her congenital heart defect.

27. Sickle cell disease is a group of inherited red blood cell disorders where cells become rigid, sticky, and misshapen ("sickled cells"), causing them to block blood flow. Sickle cell disease is particularly dangerous due to its high possibility of complications. Individuals with sickle cell disease have an altered immune response, making them more vulnerable to lung inflammation. This increased susceptibility often leads to hospitalization due to acute chest syndrome, sepsis, pain, or other complications.

28. Children with sickle cell disease have a particularly heightened susceptibility to infection, which, in turn, increases the risk of sepsis, a life-threatening emergency that happens when the body's response to an infection damages a vital organ. Sepsis often leads to death. For that reason, a fever of 101

degrees Fahrenheit in children with sickle cell disease is considered a medical emergency that should be treated by a doctor immediately.

29. Anadith's sickle cell disease and other heart-related health conditions were properly managed by her doctors and family at the time she entered the United States. She was healthy when she first encountered CBP.

**B. <u>Anadith's health condition deteriorates while in CBP custody.</u>**

30. On May 9, 2023, Anadith, her parents, and her two older siblings crossed the United States-Mexico border near Brownsville, Texas. Anadith was healthy at that time.

31. CBP detained Anadith and her family in the late evening of May 9, 2023. Over the span of the next eight days, CBP transferred Anadith and her family between several different CBP facilities, including the Donna Central Processing Center in Donna, Texas. There, Anadith tested positive for Influenza A. CBP then transferred the family to the U.S. Border Patrol Station in Harlingen, Texas, a designated isolation facility for individuals diagnosed with or closely exposed to communicable diseases. At each location, Anadith's mother, Ms. Alvarez Benedicks, informed CBP officials about Anadith's medical conditions.

32. Anadith saw LSGS medical personnel numerous times over the eight days she was held in CBP custody, but she was never transferred to a higher level of

care. Upon information and belief, none of the LSGS medical personnel that assessed Anadith ever identified themselves as a medical doctor.

33. On her eighth day in custody, after a week of grossly negligent and inadequate medical care following her influenza diagnosis, Anadith died in her mother's arms in the Harlingen isolation facility. Anadith was pronounced dead on May 17, 2023, at Valley Baptist Medical Center in Harlingen.

i. **CBP takes Anadith and her family into custody after the family crosses the United States-Mexico border near Brownsville, Texas.**

34. On May 9, 2023, Anadith, her parents, and her two older siblings crossed the United States-Mexico border near Brownsville, Texas.

35. CBP took Anadith and her family into custody along with a group of other non-citizens.

36. When the family arrived at the first CBP tent, Anadith's mother, Ms. Alvarez Benedicks, told a CBP officer about Anadith's medical conditions. She also provided the officer with a hard copy of Anadith's medical records, including a record from Anadith's doctor in Panamá documenting her sickle cell anemia and a surgeon's record of Anadith's congenital heart defect and successful heart surgery.

37. The CBP officer did not review the documents. Instead, that officer checked Anadith's pulse, used a stethoscope on Anadith, and then told Anadith's parents that Anadith was fine.

38. Anadith and her family were then taken to the Camp Monument facility in Brownsville before being transported to the Donna Central Processing Center ("Donna" or "Donna CPC") on Wednesday, May 10, 2023.

ii. **<u>CBP transfers Anadith to the Donna CPC, where Anadith tests positive for Influenza A.</u>**

39. During their intake at Donna, the United States and its employees, officers, and agents, including, but not limited to, LSGS, assessed Anadith.

40. During this intake, Ms. Alvarez Benedicks provided LSGS personnel with detailed medical documents concerning Anadith's medical history and pre-existing conditions, including her sickle cell anemia and heart conditions.

41. Anadith and her parents initially saw a female LSGS staff member who did not speak any Spanish. On information and belief, this staff member did not identify herself as a medical doctor. Anadith's mother informed that staff member of Anadith's medical conditions, but the LSGS staff member refused to review Anadith's medical records and said Anadith was fine.

42. After a prolonged wait, Anadith and her parents then saw a different male LSGS staff member. That male staff member took Anadith's medical records and reviewed them, but then told Anadith's parents that he could not do anything for Anadith at the Donna CPC at that time.

43. On information and belief, CBP entered Anadith's medical history into CBP's electronic medical record, which is operated by CBP agents.

44. On information and belief, neither CBP, LSGS, nor anyone else consulted with an on-call physician despite Anadith's complex medical needs.

45. After her assessment, CBP agents escorted Anadith, Ms. Alvarez Benedicks, and Anadith's older sister to their housing pod within the Donna CPC, while CBP took her father and older brother to separate housing.

46. CBP assigned Anadith and her mother to a housing cell that was cold and dirty, with used sanitary pads strewn about the floor and only mylar blankets provided for warmth. CBP prohibited Anadith, her mother, and the other detainees from bathing daily. CBP officers gave them water that reeked of chlorine and was all but undrinkable.

47. On or around May 14, 2023, a CBP officer filled out an I-213 form for Anadith and incorrectly reported that Anadith had "no" "medical condition[s]"—despite the multiple previous reports of Anadith's ongoing medical needs and CBP's own requirement that medical issues be documented in the I-213 form.[2]

48. Later that same day, Anadith began complaining of abdominal pain, nasal congestion, and a cough.

49. Ms. Alvarez Benedicks promptly brought Anadith's symptoms to CBP officers' and LSGS staff's attention. CBP later escorted Anadith and Ms. Alvarez

[2] Brian S. Hastings, Memorandum, U.S. CUSTOMS AND BORDER PROTECTION (May 19, 2021), https://www.cbp.gov/sites/default/files/assets/documents/2022-Aug/RGV%202021%20Documenting%20Known%20Medical_Mental%20Health%20Issues_Redacted.pdf [https://perma.cc/7EHN-ECCZ].

Benedicks from their housing pod to the medical unit at the Donna CPC, where LSGS recorded Anadith's temperature as 101.8 degrees Fahrenheit.

50. Anadith tested positive for Influenza A.

51. Although influenza and a fever of 101 degrees Fahrenheit in children with sickle cell disease is considered a medical emergency, neither CBP nor LSGS took Anadith to see a doctor.

52. Medical personnel instead provided Anadith with various medications for her symptoms, including acetaminophen, ibuprofen, and Oseltamivir ("Tamiflu"), as well as Ondansetron ("Zofran") for the flu. None of these individuals identified themselves as doctors.

53. Upon information and belief, neither the LSGS healthcare provider who assessed Anadith nor anybody else at CBP consulted an on-call physician. CBP did not transfer Anadith to a hospital.

54. Instead, CBP officials decided to transfer the entire family to the U.S. Border Patrol Station in Harlingen, Texas ("Harlingen"), the designated isolation facility for individuals diagnosed with or closely exposed to communicable diseases.

iii. **As Anadith's health declines, CBP transfers her to the Harlingen Border Patrol station.**

55. At 7:13 PM on May 14, upon arrival at the Harlingen Border Patrol station, LSGS medical personnel assessed Anadith. None of those staff members represented themselves as doctors.

56. Upon information and belief, neither LSGS medical personnel nor anybody else at CBP consulted with an on-call physician or pediatrician. CBP officers did not transfer Anadith to emergency services or a local healthcare provider, nor did they require or provide additional medical monitoring.

57. LSGS medical personnel gave Anadith medication, which CBP records indicate was Tamiflu along with fever-reducing medications. At no point did LSGS medical personnel inform Ms. Alvarez Benedicks what medication Anadith was receiving.

58. Anadith's condition continued to deteriorate over the next two days, and she began having difficulty breathing.

59. On May 16, 2023, Anadith's fever peaked at 104.9 degrees Fahrenheit according to CBP records. LSGS medical staff treated her fever only with ice packs, a cold shower, and fever-reducing medication.[3]

60. Ms. Alvarez Benedicks reminded CBP officers and the LSGS medical personnel of Anadith's health conditions and medical history and pleaded with them to call an ambulance to take Anadith to the hospital.

---

[3] *June 1, 2023 Update: Death in Custody of 8-Year-Old in Harlingen, Texas*, U.S. CUSTOMS & BORDER PROT., https://www.cbp.gov/newsroom/national-media-release/june-1-2023-update-death-custody-8-year-old-harlingen-texas [https://perma.cc/P8RC-JFM7] [hereinafter CBP June 1 Update].

61. CBP employees were cruel and dismissive. One told Ms. Alvarez Benedicks and Anadith: "Tell me how you can't breathe, because a girl that can't breathe would be passing out and you're not passing out, you're fine."[4]

62. Ms. Alvarez Benedicks told another CBP officer that Anadith had bone pain—a symptom related to sickle cell disease—and the officer told them it was part of growing up and that Anadith should drink more water.

63. Ms. Alvarez Benedicks eventually lost count of how many times she begged staff to take Anadith to the hospital.

iv. **Anadith goes limp in her mother's arms, and she is pronounced dead at Valley Baptist Medical Center in Harlingen.**

64. Anadith visited the nurse's station at the Harlingen Border Patrol station for the last time at 1:55 PM on May 17, according to CBP.[5]

65. As Anadith and Ms. Alvarez Benedicks entered the medical station, Ms. Alvarez Benedicks recalled one LSGS employee made a dismissive face.

66. At that final visit, in addition to her fever, difficulty breathing, and bone pain, Anadith also complained of pain in her chest and abdomen.

---

[4] *Minority Staff Report, The Failure to Provide Adequate Care to Vulnerable Individuals in CBP Custody*, U.S. SENATE COMMITTEE ON THE JUDICIARY at 4 (Jan. 24, 2025), https://www.judiciary.senate.gov/imo/media/doc/final_cbp_medical_care_report_with_appendix.pdf [https://perma.cc/NB8J-KYNE] [hereinafter SJC Minority Report].

[5] CBP June 1 Update.

67. LSGS medical staff performed a cursory check and dismissed Ms. Alvarez Benedicks's concerns. LSGS medical staff sent Anadith back to her cell without any additional treatment or care beyond an electrolyte drink.

68. Anadith was too weak to walk, so Ms. Alvarez Benedicks carried her back to their CBP cell in her arms. On the way, she pointed out the cell where Anadith's father was being held. Anadith turned to look toward her father. Then, Ms. Alvarez Benedicks felt Anadith's body slump into her own.

69. Ms. Alvarez Benedicks ran back to the medical station, crying that her child had died in her arms.

70. An ambulance arrived at approximately 2:07 PM and took Anadith to Valley Baptist Medical Center in Harlingen.[6]

71. CBP did not allow Ms. Alvarez Benedicks to ride in the ambulance with Anadith. Instead, CBP forced her to ride in a separate CBP vehicle. Anadith's father remained locked in his cell throughout it all.

72. At approximately 2:50 PM on May 17, 2023, Anadith was pronounced dead at the hospital.[7]

73. At the hospital, CBP officials began asking Ms. Alvarez Benedicks questions about her daughter even before informing her of her daughter's death. Ms.

[6] *Id.*
[7] *Id.*

Alvarez Benedicks learned about the pronouncement of her daughter's death from a hospital employee.

74. Almost immediately after being informed of her daughter's death, CBP officials tried to use Anadith's death to intimidate Ms. Alvarez Benedicks into choosing to self-deport with her daughter's body. Ms. Alvarez Benedicks refused.

75. CBP officials then took Ms. Alvarez Benedicks back to the Harlingen station. Upon arrival, Ms. Alvarez Benedicks noticed CBP officials cleaning the cell in which Anadith died. They placed Ms. Alvarez Benedicks and her family in an adjacent cell, segregated from any other detainees. That adjacent cell was dirty and full of trash from other detainees. Despite Anadith's recent death and the family having to process that trauma isolated and in a detention facility, CBP officials forced Ms. Alvarez Benedicks and her family to clean that cell before allowing them to leave.

### C. CBP's and LSGS's failures to render adequate medical treatment are well-documented in official reports.

#### i. CBP and its commissioner acknowledged the Government's and LSGS's failure to care for Anadith.

76. CBP's Office of Professional Responsibility ("OPR") commenced an investigation in conjunction with the medical examiner, as is customary for deaths

that occur in CBP custody. OPR issued two reports on its investigative findings following Anadith's death, on May 21, 2023, and June 1, 2023.[8]

77. The May 21, 2023, report confirmed that CBP and LSGS personnel received documents from Ms. Alvarez Benedicks during Anadith's initial medical screening at Donna CPC.

78. The report also confirmed that Anadith's family reported her medical history including sickle cell disease and her heart condition during that initial screening.

79. The report further confirmed that LSGS providers "documented a past medical history including cardiomyopathy (noting the girl had undergone heart surgery at the age of 5), about which the family reported that she has been stable since the operation, but still requires the continued care of a cardiologist."[9]

80. The June 1, 2023, report revealed that "[b]etween the time the family arrived at Harlingen Station on the evening of May 14th and the early morning hours of May 17th, CBP contracted medical personnel [presumably, LSGS] reported having approximately nine encounters with the girl and her mother, who complained of fever, flu-like symptoms, and pain."[10]

---

[8] *See Update: Death in Custody of 8-Year-Old in Harlingen, Texas*, U.S. CUSTOMS & BORDER PROT. (May 21, 2023), https://www.cbp.gov/newsroom/national-media-release/update-death-custody-8-year-old-harlingen-texas [https://perma.cc/LF4F-KFWM] [hereinafter CBP May 21 Update]; CBP June 1 Update.
[9] CBP May 21 Update.
[10] CBP June 1 Update.

81. Although Anadith's fever "peaked at 104.9 degrees during the early morning hours of May 16," the report confirmed that "[d]espite the girl's condition, her mother's concerns, and the series of treatments required to manage her condition, contracted medical personnel [LSGS] did not transfer her to a hospital for higher-level care."[11]

82. Though the full results of OPR's investigation have not been publicly disclosed, a June 2023 letter from then-acting CBP Commissioner Troy Miller to DHS Chief Medical Officer Herbert Wolfe noted that—at the direction of OPR—CBP "revoked access" to facilities "for several medical contractors who were directly involved in providing care to" Anadith.[12] That same letter stated that CBP's medical contractors, presumably LSGS, "failed to appropriately consider [Anadith's] known medical vulnerabilities."[13]

ii. **Dr. Paul Wise, the court-appointed monitor under the *Flores* Agreement, reported CBP's and LSGS's blatant failures in treating Anadith.**

83. In 1997, the U.S. government settled *Flores v. Meese*, a class-action lawsuit challenging the government's detention policies regarding immigrant minors. No. CV 85-4544-RJK (C.D. Cal.).[14] The 1997 *Flores* Settlement Agreement

---

[11] *Id.*
[12] Letter to Dr. Herbert Wolfe, DHS Chief Medical Officer (Acting) from Acting CBP Commissioner Troy A. Miller (June 9, 2023) (on file with counsel).
[13] *Id.*
[14] Stipulated Settlement Agreement, *Flores v. Reno*, No. CV-85-4544-RJK (pX) (C.D. Cal. Jan. 17, 1997), https://www.aclu.org/sites/default/files/assets/flores_settlement_final_plus_extension_of_settlement011797.pdf [https://perma.cc/TY7J-2XMZ].

("*Flores* agreement") established national standards for the detention, treatment, and release of minors in federal custody.

84. In 2022, the *Flores* court appointed Dr. Paul Wise to monitor and assess the medical safety of children in immigration custody to ensure the government met its obligations under the *Flores* agreement regarding the treatment of juvenile immigration detainees. He continued to serve in that role at the time of Anadith's death.

85. On information and belief, months before Anadith's death, Dr. Wise reported numerous shortcomings in CBP's and its contracted medical personnel's provision of medical care to children, like Anadith, in immigration custody. On information and belief, LSGS was CBP's sole contractor for medical services at the detention facilities where Anadith was detained in May 2023. The problems Dr. Wise observed prior to Anadith's death contributed to her tragic passing.

86. Dr. Wise also investigated Anadith's death and filed a report in June 2023 (the "*Flores* report") in which he concluded that her passing had been "preventable."[15]

87. In the June 2023 *Flores* report, Dr. Wise noted several failures in CBP's and its "contracted medical system['s]" (i.e. LSGS's) treatment of Anadith,

[15] Notice of Filing of Juvenile Care Monitor Report by Dr. Paul H. Wise, Doc. 1352 at 38, *Flores v. Garland*, CV 854544-DMG (C.D. Cal. July 18, 2023), https://youthlaw.org/wp-content/uploads/2023.07.18_flores-juvenile-care-monitor-report.pdf [https://perma.cc/65FC-UJF5] [hereinafter *Flores* report].

including their failure to consult with a physician, their failure to communicate Anadith's elevated medical risk to those treating her, and their failure to transfer Anadith to a hospital.[16] According to Dr. Wise, had a physician been consulted, "the need for enhanced concern regarding any change in medical status could have been discussed . . . and entered into the [electronic medical record]," and "could have guided the decision-making of medical providers, including the need for transfer to a health facility, on subsequent shifts and in the Harlingen BP Station."[17]

88. Dr. Wise also highlighted CBP's "failure to notify" the personnel responsible for Anadith's care of her elevated medical risk.[18] Noting that CBP "is ultimately responsible for the well-being of all individuals of custody," Dr. Wise deemed this failure a "breach of essential communication."[19]

89. Dr. Wise also reported on CBP's failure to transfer Anadith to a hospital, which he said raised "profound concerns regarding not only the direct care [Anadith] received but also the custodial and medical systems that failed to prevent [her] clinical deterioration and death."[20] Dr. Wise made "no judgment as to the reasons why the health providers responsible for [Anadith's] care in the Harlingen Station were so reluctant to transfer [Anadith] to a local hospital."[21] Nevertheless,

---

[16] *Id*. at 38–41.
[17] *Id*. at 39.
[18] *Id*.
[19] *Id*.
[20] *Id*. at 40.
[21] *Id*.

Dr. Wise observed that CBP "personnel have, on occasion, questioned a medical provider's decision to transfer a patient to a local hospital, stressing the drain on [CBP] manpower."[22] Dr. Wise further emphasized that "[t]he decision to transfer an ill individual to a local health facility should be based on medical criteria alone."[23]

90. Finally, Dr. Wise noted that as Anadith's health declined, Ms. Alvarez Benedicks "repeatedly reported that her daughter's condition was deteriorating and that she needed to be transported immediately to a local hospital."[24] CBP's chosen medical staff and CBP agents delayed calling an ambulance as long as possible: until Anadith "lost consciousness and suffered an apparent cardiac arrest."[25]

91. As confirmed by Dr. Wise, CBP has systemically failed in upholding its duty to children in custody for years. Anadith's case is not a tragic exception.

iii. **Whistleblowers have reported long-standing concerns about CBP's and LSGS's failures in providing medical care.**

92. On November 30, 2023, Troy Hendrickson, Contract Officer Representative for CBP's Medical Services Contract, filed a whistleblower disclosure regarding the failures in medical services provided by LSGS.[26] He alleged

---

[22] *Id*.
[23] *Id*. at 41.
[24] *Id.* at 37.
[25] *Id*. at 37–38.
[26] *See generally* Protected Whistleblower Disclosures Regarding the Performance and Oversight Failures of the Medical Services Contract of U.S. Customs and Border Protection with Loyal Source Government Services, GOV'T ACCOUNTABILITY PROJECT (Nov. 30, 2023), https://whistleblower.org/wp-content/uploads/2023/11/11-30-2023-Hendrickson-Congressional-Disclosure.pdf [https://perma.cc/9B8A-EEAG] [hereinafter Hendrickson Disclosure]. Mr. Hendrickson is represented by the Government Accountability Project. *Id*.

serious performance failures by LSGS, including understaffing, unqualified medical providers, and billing irregularities.

93. Mr. Hendrickson began raising concerns within two weeks of starting his role as a CBP contract officer for the Medical Services Contract in August 2021—years before Anadith's death.[27] He heard reports of Border Patrol agents and CBP medical providers, including LSGS, working in CBP facilities with expired licensing, pending claims and investigations against them, improper credentials, and/or inadequate supervision.[28] Mr. Hendrickson also accused the CBP Office of Acquisition ("OA") of failing to hold LSGS accountable for these failures.[29]

94. In January 2022, Mr. Hendrickson organized an emergency meeting with OA and the CBP Office of Chief Counsel regarding LSGS's failure to staff CBP medical facilities. There were "entire shifts where no [medical] provider is available at all."[30] Mr. Hendrickson asked for an official notice to LSGS that they were not meeting the terms of the contract, but no such notice was issued.

95. Shortly after that meeting, CBP surveyed former LSGS employees about why they left LSGS.[31] Reasons included "poor communication from management; mismanagement from senior management and HR as well as a lack of

[27] *Id*. at 6.
[28] *Id*.
[29] *Id*.
[30] *Id*. at 7.
[31] *Id*.

accountability for misconduct; employees not showing up to scheduled shifts; failure to schedule employees within their availability despite short staffing; complaints and requests for more resources going ignored; below market pay rates; safety concerns associated with understaffing; and no response to concerns of employees falsifying medical records, among other problems."[32]

96. Mr. Hendrickson urged LSGS to hire more personnel to fulfill its staffing obligations and ensure adequate medical care, but LSGS claimed "they did not have enough money to pay employees competitively" while in reality "profiting heavily while their employee pay was low."[33]

97. Mr. Hendrickson also observed that LSGS frequently failed to use the Electronic Medical Records System ("EMR") "due to staff refusing to use it, internet outages, or Loyal Source management instructing staff to go offline during 'surges' of the number of noncitizens in CBP custody. This failure to properly use the EMR conflicted with Loyal Source's representations that the company was using EMR and supported its use."[34]

98. Mr. Hendrickson's disclosure notes a publicly available 2022 Office of the Immigration Detention Ombudsman ("OIDO") report, which confirmed LSGS's

---

[32] *Id.* at 7–8.
[33] *Id.* at 8–9.
[34] *Id.* at 8.

"critical staffing shortage" across CBP facilities.[35] The public report redacts the precise staffing shortage percentages but states that "LSGS ha[d] an approximately 35 percent shortfall in contracted medical services being provided to CBP at the sampled locations."[36] The OIDO report also notes that LSGS submitted staffing reports to CBP each week.[37]

99. LSGS failed to remediate these staffing shortages.

100. Mr. Hendrickson claims CBP retaliated against him for raising these concerns, first by removing him from his position as the Contract Officer Representative for CBP's Medical Services Contract, and later by denying him a promotion.[38]

101. On February 16, 2024, multiple employees of CBP and LSGS who chose to remain anonymous submitted an additional whistleblower disclosure through the Government Accountability Project.[39] In that disclosure, those whistleblowers corroborated Mr. Hendrickson's report and detailed further concerns about LSGS.

---

[35] *See* Ombudsman Alert: Critical Medical Understaffing on the Border, OFF. OF THE IMMIGR. DET. OMBUDSMAN, OIDO-22-003, at 3 (July 12, 2022), https://www.dhs.gov/sites/default/files/2022-08/OIDO%20Ombudsman%20Alert%20CBP%20Medical%20Contract%20Final_508.pdf [https://perma.cc/H6YH-LXWY].
[36] *Id*. at 4.
[37] *Id*. at 3.
[38] Hendrickson Disclosure at 15–17.
[39] *See generally* Protected Whistleblowers' Disclosures Regarding Failure of CBP Leadership and CBP Office of Acquisition to Oversee its Medical Services Contract with Loyal Source Government Services and Ongoing Wrongdoing by Acting CBP Chief Medical Officer, GOV'T ACCOUNTABILITY PROJECT (Feb. 16, 2024), https://whistleblower.org/wp-content/uploads/2024/02/02-16-2024-CBP-Medical-Services-Whistleblower-Disclosure.pdf [https://perma.cc/JB48-TEUR] [hereinafter LSGS Disclosure].

102. For example, the second disclosure noted that "Loyal Source permitted and encouraged employees to transfer to stations in states in which their medical licenses might not have applied or which may have required testing or refresher courses to be able to lawfully practice in the state."[40] Additionally, "Emergency Medical Technicians, whose roles are primarily to provide support to [but not replace] Nurse Practitioners, were frequently the only medical staff on site."[41]

103. LSGS provided its employees inadequate, minimal training.[42] In some instances, new employees only briefly shadowed older employees before working independently with no other training or manuals.

104. LSGS employees often had to procure their own medical supplies due to LSGS's failure to provide basic equipment including bandages, thermometers, face masks, and printer paper.[43]

105. Most concerningly, LSGS providers often failed to send patients with complex, life-threatening health concerns to a hospital.[44]

106. Although Mr. Hendrickson and other CBP employees alerted CBP to LSGS's failures, CBP continued to underprioritize its obligations to provide adequate medical services to those in its custody. According to Mr. Hendrickson,

---

[40] *Id*. at 27.
[41] *Id*.
[42] *Id.* at 26.
[43] *Id.* at 27.
[44] *See id.* at 28.

CBP retaliated against multiple whistleblowers and promoted CBP employees who actively refused to hold LSGS accountable.[45]

107. Upon information and belief, CBP and LSGS were aware of LSGS's staffing shortages and other failures detailed in both whistleblowers' disclosures, yet failed to fix these problems prior to Anadith's preventable death.

iv. **The U.S. Senate Committee on the Judiciary's investigation confirmed CBP's critical failures with regard to Anadith's care.**

108. The U.S. Senate Committee on the Judiciary ("SJC") also investigated CBP's failures in treating Anadith. On January 24, 2025, the SJC released a report entitled: "The Failure to Provide Adequate Care to Vulnerable Individuals in CBP Custody."[46] This report included numerous investigative findings regarding Anadith's death. The SJC unequivocally concluded that CBP and LSGS were responsible for her death: "The circumstances that resulted in Anadith's death were unfortunately not an aberration, but indicative of systemic problems with the provision of medical care in CBP facilities and CBP's broader failure to properly oversee that care."[47] The SJC further noted: "Transparency is key to maintaining public trust and holding CBP accountable for the care provided in its facilities."[48]

[45] *Id.* at 31 & n.37.
[46] SJC Minority Report.
[47] *Id*. at 10.
[48] *Id*. at 43.

109. The SJC elaborated on these "systemic problems," concluding that CBP's systemic delivery of inadequate medical care led to Anadith's death: "The Committee's investigation revealed longstanding failures in the provision of medical care in CBP custody. Despite efforts to draw attention to CBP's inability to provide adequate medical care, including by CBP's Office of Chief Medical Officer (OCMO), many concerns were not sufficiently addressed, leading to the conditions that caused Anadith's death in 2023."[49]

110. The SJC report also confirmed that Anadith's "medical history was documented in the EMR system when her family was first taken into custody and transported to the Donna Centralized Processing Facility," but that CBP and LSGS medical personnel did not check the EMR system.[50] Instead, CBP and LSGS personnel claimed to be "unaware Anadith had sickle cell anemia or a history of congenital heart disease."[51]

111. The report continued: "Compounding the problem, at this time, CBP did not have adequate agency guidance describing how to identify and consistently monitor children in custody who were considered medically at-risk."[52] The SJC also reported CBP's failure to communicate Anadith's medical conditions and risk to the

[49] *Id*. at 1.
[50] *Id*. at 3-4.
[51] *Id*. at 4.
[52] *Id*. at 29.

CBP and LSGS staff treating her. According to the SJC, CBP's and LSGS's failures led to Anadith's death.

112. The SJC specifically faulted CBP's and LSGS's failure to transfer Anadith to a hospital and CBP's "failure to capture video of [LSGS] medical contractor staff interacting with Anadith and her family at the Harlingen station."[53] On the former, the SJC quoted from Dr. Wise's July 2023 report, noting that "the admission of a young child with sickle cell disease and a fever to the Harlingen Station should have triggered a close consultation with an on-call pediatrician or an evaluation at a local hospital."[54] On the latter, the Committee pointed out that the failure to capture video footage "has complicated the investigation of her death,"[55] additionally noting that "[s]ome questions may never be answered without video evidence."[56]

113. Finally, the SJC report reiterated the CBP and LSGS whistleblowers' concerns about substandard medical care and oversight: "CBP and Loyal Source whistleblowers have alleged that CBP's Office of Acquisitions failed to hold [LSGS] accountable for deficient medical care over a number of years."[57] Whistleblowers and DHS oversight offices "attributed inadequate medical care in CBP facilities to,

---

[53] *Id*. at 35.
[54] *Id*. at 29.
[55] *Id.* at 35.
[56] *Id.*
[57] *Id*. at 5.

among other factors, understaffing, an inadequate electronic medical records system, and a lack of clarity related to roles and responsibilities in the delivery of medical care."[58]

114. The report cited heavily to a June 2023 internal memo from DHS Acting Chief Medical Officer Herbert O. Wolfe to CBP Acting Commissioner Troy Miller that detailed a "review of CBPs [sic] medical care practices" immediately following Anadith's death.[59] That memo confirmed several shortcomings of CBP and medical care contractors, presumably LSGS, including: (1) a lack of established practices to identify the presence of medically at-risk individuals in CBP facilities; (2) the failure of medical providers responsible for care to review critical clinical information, including medical history; and (3) a finding that the medical care at the Harlingen isolation facility was "inadequate and lacked sufficient medical engagement and accountability to ensure safe, effective, humane, and well-documented medical care of individuals who were placed in medical isolation."[60]

115. Dr. Wolfe specifically criticized CBP's management of its Medical Services Contract with LSGS as "leading to unsafe medical care delivery conditions and the increased likelihood for preventable harm."[61]

---

[58] *Id.*
[59] *Id.* at Exh. I.
[60] *Id.*
[61] *Id.*

116. Dr. Wolfe also opined that the Harlingen Station facility staffed by LSGS employees "lacked sufficient medical engagement and accountability to ensure safe, effective, humane, and well-documented medical care."[62] He noted poor communication among staff members, a lack of clear guidelines for seeking help from doctors, and a poor system for managing medical records.[63] He further noted that the LSGS medical ward's list of on-call doctors and pediatricians was out of date because it was so rarely used.[64]

117. On information and belief, prior to Anadith's death, CBP failed to appropriately train CBP officials and LSGS medical personnel on identifying high-risk detainees experiencing medical distress.[65] The Committee noted that even after Anadith's death, CBP "does not edit or otherwise control the guidance that [LSGS] disseminates to its staff."[66]

118. Furthermore, one internal CBP memo noted that (1) LSGS personnel were "not completing required CBP training," (2) "non-cleared" LSGS personnel worked at CBP stations, and (3) LSGS personnel failed to use the EMR as required.[67] Despite those concerns, CBP filed a Contractor Performance Assessment Report for

---

[62] *Id*.
[63] *Id*.
[64] *Id.*; *see also* Nick Miroff, *Inquiry after girl's death reports unsafe medical care in U.S. border facilities*, WASH. POST (Jun. 22, 2023), https://www.washingtonpost.com/immigration/2023/06/22/medical-care-unsafe-borderfacilities-migrants/ [https://perma.cc/2KDV-PDPL].
[65] SJC Minority Report. at 18 & n.128.
[66] *Id.* at 18.
[67] *Id*. at Exh. N.

LSGS that did not "adequately reflect incumbent contractor performance."[68] On information and belief, LSGS consistently flouted its contractual obligations to provide adequate medical care, and CBP knew of these failures yet chose not to address them.

## PLAINTIFFS' PAIN AND SUFFERING

119. Prior to Anadith's death, Plaintiffs shared a close, loving relationship with their child. Plaintiffs were actively involved in Anadith's life and upbringing and experienced joy with her. This relationship with Anadith ended abruptly when she died in CBP's custody.

120. Mabel Estanislada Alvarez Benedicks—Anadith's mother—felt Anadith die in her arms, and CBP did not even allow her to ride in the ambulance with Anadith to the hospital.

121. Since Anadith's death, Ms. Alvarez Benedicks has experienced depression, significant anxiety, and sleep disturbances. She has sought mental health treatment and counseling. Ms. Alvarez Benedicks currently visits her psychiatrist every two weeks and is taking medication for her mental health. Ms. Alvarez Benedicks's need for this care is the direct result of the trauma and grief caused by Anadith's death.

---

[68] *Id.*

122. CBP separated Anadith's father, Rossel Doney Reyes Martinez, from Ms. Alvarez Benedicks and Anadith. Unable to intervene or assist from his housing cell, he was helpless as he saw Anadith go limp and die in her mother's arms. Since Anadith's death, Mr. Reyes Martinez has also experienced depression, anxiety, and sleep disturbances.

123. Additionally, Plaintiffs continue to support and care for their surviving children, Anadith's siblings. Both of their surviving children have also experienced trauma, anxiety, and depression directly caused by their sister's death.

124. Plaintiffs have suffered the loss of Anadith's companionship, comfort, and love. They have suffered mental anguish and will continue to carry the weight of their grief every single day.

125. As a direct and proximate cause of Anadith's death, Plaintiffs have suffered and will continue to suffer emotional distress, grief, and mental anguish.

## CULPABILITY OF THE UNITED STATES AND LSGS

### A. CBP and LSGS knew or should have known of the dangerous detention conditions for children like Anadith.

126. The United States government knew or should have known that it placed Anadith at risk of severe harm by at least: (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately

categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to upgrade Anadith to a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately train CBP officers, employees, and agents, including LSGS personnel.

127. For years, it has been widely known that several children have died in immigration detention due to infectious diseases they contracted in custody.

128. On information and belief, a 16-year-old boy from Guatemala died in 2019 of complications from the flu he contracted in CBP custody.

129. On information and belief, between December 2018 and May 2019, five Guatemalan children died after being taken into CBP custody, including at least three as a result of the flu.

130. Public health organizations have expressed concerns that overcrowded, unsanitary conditions in immigration detention have led to the spread of infectious diseases.

131. The United States has known of these dangerous conditions. Indeed, the Office of the Inspector General for DHS issued a report concluding that there existed "gaps in CBP's medical policies" including that "CBP's TEDS [CBP's National Standards on Transport, Escort, Detention, and Search] policy does not

include procedures to guide agents and officers on recognizing symptoms for 'at-risk' individuals, such as coughing or difficulty breathing, red or flushed cheeks, or lethargy, to indicate they should refer the individual to receive medical care."[69]

132. Additionally, CBP was fully aware of the insufficiency and understaffing of its agent, LSGS. In fact, several whistleblowers at CBP, including Mr. Hendrickson, raised critical concerns to their CBP supervisors about LSGS's provision of medical care to detained immigrants. Instead of addressing these concerns, CBP retaliated against certain whistleblowers, including by terminating Mr. Hendrickson.[70]

133. On information and belief, LSGS was independently aware of the insufficient staffing and medical care it was providing at CBP border stations. Neither CBP nor LSGS took action to address the significant understaffing.[71] Although LSGS represented to CBP that it used the EMR system, LSGS personnel frequently refused to use the system.[72]

134. Former LSGS employees reported that LSGS provided minimal and inconsistent training; did not appropriately conduct background checks to ensure that its staff were appropriately licensed; and left stations understaffed (sometimes

[69] OFF. OF INSPECTOR GEN., HOMELAND SEC., OIG-21-48, CBP NEEDS TO STRENGTHEN ITS OVERSIGHT AND POLICY TO BETTER CARE FOR MIGRANTS NEEDING MEDICAL ATTENTION, at 6 (July 20, 2021), https://www.oig.dhs.gov/sites/default/files/assets/2021-07/OIG-21-48-Jul21.pdf [https://perma.cc/SZE7-BRKB] [hereinafter OIG-21-48].
[70] *See generally* Hendrickson Disclosure.
[71] *Id.* at 7.
[72] *Id.* at 8.

unstaffed) and lacking basic medical equipment.[73] Moreover, LSGS management "specifically directed staff not to raise medical issues to CBP" and some LSGS providers did not refer patients to local health systems when medical emergencies arose.[74]

### B. <u>CBP was legally obligated to provide safe and sanitary care as well as adequate medical treatment to Anadith under the *Flores* agreement and internal agency standards, rules, and regulations.</u>

135. CBP had no discretion to treat Anadith as it did, particularly because the actions of its officers, employees, and agents violated binding obligations under the *Flores* agreement and internal agency standards, rules, and regulations. Acts that violate court orders and internal rules cannot be subject to the FTCA's discretionary-function exception.

136. CBP was legally obligated to provide safe and sanitary care and adequate medical treatment to Anadith—an at-risk child with complex medical needs—under its own published policies and the *Flores* agreement.

137. CBP's TEDS and the *Flores* agreement establish non-discretionary duties that it owes to minors in its custody.

[73] LSGS Disclosure at 27–28.
[74] *Id.* at 28.

i. **TEDS**

138. CBP adopted TEDS in 2015. TEDS govern CBP's interaction with detained individuals.[75]

139. Upon an individual's detention in a CBP holding facility, CBP officers are required to screen the individual. CBP officers must determine if the detainee is "at-risk"—including whether the detainee has a disability or serious illness.[76]

140. Agents must place at-risk individuals in the least restrictive setting appropriate to their age and special needs and must expeditiously process them to minimize their time in custody.[77]

141. Agents must also electronically document any "[r]easonable medical care requested/provided/declined" to or by at-risk individuals.[78]

142. Officers and agents must also perform a medical evaluation of each person detained by asking about and visually inspecting for signs of illness or other health concerns. Illnesses "should be communicated to a supervisor, documented in the appropriate electronic system(s) of record, and appropriate medical care should be provided or sought in a timely manner."[79]

---

[75] U.S. CUSTOMS AND BORDER PROT., NATIONAL STANDARDS ON TRANSPORT, ESCORT, DETENTION, AND SEARCH ("TEDS"), Foreword from the Commissioner (Oct. 2015), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf [https://perma.cc/44T3-LVVB].

[76] *Id*. § 4.2.

[77] *Id*. § 5.6.

[78] *Id*. § 5.3.

[79] *Id*. § 4.3.

143. Officers and agents are also required to "monitor" and "closely supervise" detainees in holding rooms.[80]

144. Officers and agents must physically check holding rooms where at-risk detainees are staying, including any juveniles, in a "regular and frequent manner."[81]

145. These checks "ensure the individual's basic needs, such as food and water, are met and no other medical issues have arisen during detainment. During such checks, agents and officers are required to physically observe individuals and document any observations from medical screenings or welfare checks on CBP's paper forms and in CBP's systems of record."[82]

146. Officers also must document any illness observed to their supervisor and provide or seek appropriate medical care.[83]

147. In the event of a medical emergency, CBP officers are required to immediately contact emergency services, document the call in the appropriate electronic system, and notify the shift supervisor. A medical emergency explicitly includes "difficulty breathing."[84]

148. In 2021, CBP sent a memorandum advising all CBP agents of the requirement to document known medical health issues on the I-213 form and CBP

[80] *Id.* § 4.6.
[81] *Id.* § 5.1.
[82] OIG-21-48 at 3.
[83] TEDS § 5.6.
[84] *Id.* § 4.10.

Form 2500. The memo also instructed officers to document any additional care and oversight provided as a result of identified health issues.[85]

ii. **The *Flores* Agreement**

149. The *Flores* agreement, finalized in 1997 and subsequently re-affirmed and further clarified, establishes binding national standards for the detention, treatment, and release of immigrant children in United States custody.[86]

150. Under the 2022 clarification of the *Flores* agreement that applies to children in CBP detention in the Rio Grande Valley and El Paso sectors, CBP is required to provide appropriate and enhanced medical support for juvenile detainees, from intake to detention to release, through "a layered approach to medical support, endeavoring to ensure no single point of failure."[87]

151. At intake, CBP must conduct detailed health interviews with all juveniles upon arrival into custody using the CBP Form 2500.[88] During that interview, CBP must identify children 12 and under, along with any individual "with an illness, injury, disease, or other medical issue," and "make the appropriate

[85] Brian S. Hastings, *Documenting Known Medical/Mental Health Issues*, U.S. CUSTOMS AND BORDER PROTECTION (May 19, 2021), https://www.cbp.gov/sites/default/files/assets/documents/2022-Aug/RGV%202021%20Documenting%20Known%20Medical_Mental%20Health%20Issues_Redacted.pdf [https://perma.cc/7EHN-ECCZ].

[86] Stipulated Settlement Agreement, *Flores v. Reno*, No. CV-85-4544-RJK (pX) (C.D. Cal. Jan. 17, 1997), https://www.aclu.org/sites/default/files/assets/flores_settlement_final_plus_extension_of_settlement011797.pdf [https://perma.cc/TY7J-2XMZ].

[87] CBP Settlement Agreement, *Flores v. Garland*, No. 2:85-cv-4544-DMG-AGR (C.D. Cal. May 21, 2022) § VII(3)(B)(3), https://youthlaw.org/wp-content/uploads/cbp-settlement-agreement.pdf [https://perma.cc/3HZJ-E789].

[88] *Id.* § VII(3)(D)(1) & Exh. 2.

disposition," under the circumstances, which may include activating 911/EMS; referring or transporting the patient to a local health system; or referring to the onsite medical provider, if available, for further evaluation and assessment.[89]

152. The *Flores* settlement further imposes duties on CBP throughout the detention of minors in CBP custody. Among other obligations, the settlement requires CBP to:

- Refer "[c]omplex or emergency issues" or "urgent or emergent medical issues" to the local health system.[90]
- Engage board-certified pediatricians to serve as contracted pediatric advisors. In that role, pediatric advisors should provide consultation support to medical staff for complex juvenile cases.[91]
- "[R]ely heavily on referrals to local health systems (and local standards of care) . . . who have more robust medical capabilities."[92]
- "[E]nsure appropriate documentation of medical information" and establish an electronic health record as part of its medical support efforts.[93]
- Provide a supplemental health interview to minors every five days in custody if a juvenile remains in CBP custody for longer than 72 hours (defined as "extended time in custody").[94]
- Conduct "enhanced medical monitoring" of all minors with significant medical issues or concerns. Enhanced medical monitoring must be tailored to the juvenile's clinical situation, but should, at the minimum, consist of a documented symptom and temperature check every four hours. CBP must also establish a process to track persons under enhanced medical monitoring and the turnover of shifts and rotations of providers monitoring such persons.

[89] *Id.* § VII(3)(D)(1).
[90] *Id.* §§ VII(3)(D)(3); VII(3)(B)(3).
[91] *Id.* Annex I § IA.
[92] *Id.* § VII(3)(B)(2).
[93] *Id*. Annex I § IH.
[94] *Id.* § VIII(1).

"Enhanced medical monitoring shall identify class members whose condition is deteriorating or who are not making expected progress, and prompt notification will be made to pediatric advisors or to the local health system, as appropriate."[95]

- Provide orientation and training to CBP employees and contractors, such as LSGS, about the requirements of the *Flores* agreement, including the referral of children with medical concerns.[96]

153. Finally, CBP-contracted medical personnel "shall conduct exit health interviews . . . to ensure persons in custody are fit for travel or transfer" when leaving CBP custody.[97]

## C. **CBP's conduct violated the Due Process Clause of the Fifth Amendment.**

154. The actions of CBP's officers and employees violated binding obligations under the United States Constitution. Prohibited acts cannot be discretionary.

155. The Due Process Clause of the Fifth Amendment protects immigration detainees from deliberate indifference to serious medical needs. *See, e.g.*, *Coronel v. Decker*, 449 F. Supp. 3d 274, 282 (S.D.N.Y. 2020); *see also Basank v. Decker*, 449 F. Supp. 3d 205, 214 (S.D.N.Y. 2020) ("Immigration detainees can establish a due process violation for unconstitutional conditions of confinement by showing that a government official 'knew, or should have known' of a condition that 'posed an excessive risk to health,' and failed to take appropriate action.").

---

[95] *Id.* § VIII(2); Annex I § ID.
[96] *Id.* § XII, Annex I § IC.
[97] *Id.* § VII(3)(D)(6).

156. To establish a due process violation, the Plaintiffs must show a "serious medical need" and "that the Defendant[] acted with deliberate indifference to such need[]." *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019).

157. Anadith had serious medical needs and was at a much higher risk of serious complications if she contracted illnesses while in custody.

158. Regardless of those serious medical needs, CBP acted with deliberate indifference to Anadith, including through its employees, officers, and agents. It (1) failed to provide Anadith with medical treatment that met the applicable standard of care; (2) failed to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failed to appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refused to upgrade Anadith to a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignored Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failed to appropriately train CBP officers, employees, and agents, including LSGS.

159. CBP's actions shock the conscience and demonstrate more than deliberate indifference toward and reckless disregard for Anadith's serious medical needs. CBP therefore violated Anadith's due process rights. Following the Constitution is not subject to the whims of discretion. *See, e.g.*, *Myers & Myers Inc.*

*v. USPS*, 527 F.2d 1252, 1261 (2d Cir. 1975) ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority.").[98]

**FIRST CAUSE OF ACTION AGAINST THE UNITED STATES**
**(Texas Survival Statute: Negligence)**
**(Tex. Civ. Prac. & Rem. Code § 71.021)**
**(Asserted Through the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1))**

160. Plaintiffs repeat and restate each of the above allegations.

161. Plaintiffs are the surviving parents of Anadith. Plaintiffs Ms. Alvarez Benedicks and Mr. Reyes Martinez bring this action in their capacity as heirs and legal representatives of the Estate under the Texas Survival Statute. TEX. CIV. PRAC. & REM. CODE § 71.021.

162. The United States[99] was directly responsible for Anadith's health and safety while she was in CBP custody. The United States owed a duty to provide reasonable care to detainees, including Anadith, and to ensure that the medical care administered adhered to the standards of pediatric medical care and obligations

[98] *See also, e.g.*, *Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016) ("We hold that the FTCA's discretionary-function exception does not provide a blanket immunity against tortious conduct that a plaintiff plausibly alleges also flouts a constitutional prescription."); *Limone v. United States*, 579 F.3d 79, 101 (1st Cir. 2009) ("[T]he discretionary function exception does not . . . shield conduct that transgresses the Constitution."); *Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003) (concluding that government's actions "f[e]ll outside the FTCA's discretionary-function exception because [the plaintiff] alleged they were conducted in violation of [his constitutional rights]"); *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001) ("[F]ederal officials do not possess discretion to violate constitutional rights . . . ." (quoting *United States Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988))); *Nurse v. United States*, 226 F.3d 996, 1002 n.2 (9th Cir. 2000) ("The Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply.").

[99] As used throughout these causes of action, actions of the United States also include those actions performed by its employees, officers, and agents, including LSGS.

under TEDS and the *Flores* agreement. The United States owed a duty to exercise reasonable care to avoid a foreseeable risk of injury to Anadith.

163. The United States breached its nondiscretionary duties in at least six ways: (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to upgrade Anadith to a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately train CBP officers, employees, and agents, including LSGS.

164. The United States also failed to appropriately train its employees, officers, and agents and adequately staff its facilities with the personnel required to provide adequate care.

165. Through its numerous failures outlined above, the United States' employees, officers, and agents drastically increased the risk of harm to Anadith, causing her death.

166. Any reasonable person, especially a reasonable healthcare provider, would have foreseen that failing to treat a critically ill child with sickle cell anemia

and chronic heart disease—including once she was acutely ill with a fever and having trouble breathing—would lead to further injury or death.

167. Any reasonable government actor providing care for detainees would have foreseen that the United States' conduct would lead to further injury or death.

168. As a direct and proximate result of the United States' grossly negligent, reckless, and deliberately indifferent conduct, Anadith suffered extreme and extended physical, mental, and emotional pain, distress, and death.

169. Had she lived, Anadith would have been entitled to bring an action against the United States for the injuries it inflicted on her.

170. As a direct and proximate result of the United States' grossly negligent, reckless, and deliberately indifferent conduct, Anadith's parents, Ms. Mabel Estanislada Alvarez Benedicks and Mr. Rossel Doney Reyes Martinez, suffered extreme mental and emotional pain and distress, as well as loss of companionship, support, enjoyment of life, and other benefits that would have been provided by Anadith.

## SECOND CAUSE OF ACTION AGAINST THE UNITED STATES
**(Texas Survival Statute: Gross Negligence)**
**(Tex. Civ. Prac. & Rem. Code § 71.021)**
**(Asserted Through the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1))**

171. Plaintiffs repeat and restate each of the above allegations.

172. Plaintiffs are the surviving parents of Anadith. Plaintiffs Ms. Alvarez Benedicks and Mr. Reyes Martinez bring this action in their capacity as heirs and

legal representatives of the Estate under the Texas Survival Statute. TEX. CIV. PRAC. REM. CODE § 71.021.

173. The United States was directly responsible for Anadith's health and safety while she was in CBP custody. The United States owed a duty to provide reasonable care to detainees, including Anadith, and to ensure that the medical care administered adhered to the standards of pediatric medical care and obligations under TEDS and the *Flores* agreement. The United States owed a duty to exercise reasonable care to avoid a foreseeable risk of injury to Anadith.

174. The United States breached its nondiscretionary duties in at least six ways: (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to upgrade Anadith to a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately train CBP officers, employees, and agents, including LSGS.

175. The United States also failed to appropriately train its employees, officers, and agents and adequately staff its facilities with the personnel required to provide adequate care.

176. Through its numerous failures outlined above, the United States' employees, officers, and agents drastically increased the risk of harm to Anadith, causing her death.

177. The actions of the United States and its employees, officers, and agents involved an extreme degree of risk considering the probability and magnitude of the harm it could, and did, cause Anadith.

178. The United States and its employees, officers, and agents had actual, subjective awareness of the risks involved, but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others.

179. Any reasonable person, especially a reasonable healthcare provider, would have foreseen that failing to treat a critically ill child with sickle cell anemia and chronic heart disease—including once she was acutely ill with a fever and having trouble breathing—would lead to further injury or death.

180. Any reasonable government actor providing care for detainees would have foreseen that the United States' conduct would lead to further injury or death.

181. As a direct and proximate result of the United States' grossly negligent, reckless, and deliberately indifferent conduct, Anadith suffered extreme and extended physical, mental, and emotional pain, distress, and death.

182. Had she lived, Anadith would have been entitled to bring an action against the United States for the injuries it inflicted on her.

183. As a direct and proximate result of the United States' grossly negligent, reckless, and deliberately indifferent conduct, Anadith's parents, Ms. Mabel Estanislada Alvarez Benedicks and Mr. Rossel Doney Reyes Martinez, suffered extreme mental and emotional pain and distress, as well as loss of companionship, support, enjoyment of life, and other benefits that would have been provided by Anadith.

**<u>THIRD CAUSE OF ACTION AGAINST THE UNITED STATES</u>**
**(Texas Survival Statute: Negligent Undertaking)**
**(Tex. Civ. Prac. & Rem. Code § 71.021)**
**(Asserted Through the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1))**

184. Plaintiffs repeat and restate each of the above allegations.

185. Plaintiffs are the surviving parents of Anadith. Plaintiffs Ms. Alvarez Benedicks and Mr. Reyes Martinez bring this action in their capacity as heirs and legal representatives of the Estate under the Texas Survival Statute. TEX. CIV. PRAC. & REM. CODE § 71.021.

186. The United States was directly responsible for Anadith's health and safety while in custody. The United States owed a duty to provide reasonable care

to detainees, including Anadith, and to ensure that the medical care administered adhered to the standards of pediatric medical care and obligations under TEDS and the *Flores* agreement. The United States owed a duty to exercise reasonable care to avoid a foreseeable risk of injury to Anadith.

187. By agreeing to the provisions in the *Flores* agreement, TEDS, and other regulations, The United States and its employees, officers, and agents assumed duties to provide appropriate medical care for children in its custody that the United States knew or should have known were necessary for the protection of those children.

188. The United States breached its nondiscretionary duties in at least six ways: (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to upgrade Anadith to a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately train CBP officers, employees, and agents.

189. The United States also failed to appropriately train its employees, officers, and agents and adequately staff its facilities with the personnel required to provide the adequate care that it had a duty to provide.

190. Plaintiffs relied on the United States' performance of its nondiscretionary duties.

191. Through their numerous failures outlined above, the United States' employees, officers, and agents drastically increased the risk of harm to Anadith, causing her death.

192. Any reasonable person, especially a reasonable healthcare provider, would have foreseen that failing to treat a critically ill child with sickle cell anemia and chronic heart disease—including once she was acutely ill with a fever and having trouble breathing—would lead to further injury or death.

193. As a direct and proximate result of the United States' grossly negligent, reckless, and deliberately indifferent conduct, Anadith suffered extreme and extended physical, mental, and emotional pain, distress, and death.

194. Had she lived, Anadith would have been entitled to bring an action against the United States for the injuries it inflicted on her.

195. As a direct and proximate result of the United States' grossly negligent, reckless, and deliberately indifferent conduct, Anadith's parents, Ms. Mabel Estanislada Alvarez Benedicks and Mr. Rossel Doney Reyes Martinez, suffered

extreme mental and emotional pain and distress, as well as loss of companionship, support, enjoyment of life, and other benefits that would have been provided by Anadith.

**FOURTH CAUSE OF ACTION AGAINST THE UNITED STATES**
**(Texas Survival Statute: Negligent Supervision)**
**(Tex. Civ. Prac. & Rem. Code § 71.021)**
**(Asserted Through the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1))**

196. Plaintiffs repeat and restate each of the above allegations.

197. Plaintiffs are the surviving parents of Anadith. Plaintiffs Ms. Alvarez Benedicks and Mr. Reyes Martinez bring this action in their capacity as heirs and legal representatives of the Estate under the Texas Survival Statute. TEX. CIV. PRAC. & REM. CODE § 71.021.

198. The United States and its employees, officers, and agents in supervisory roles at DHS have a duty to properly supervise other employees, officers, and agents; to oversee the Donna Processing Center and the Harlingen Station; and to oversee transfer decisions for ill detainees.

199. The United States' negligent supervision proximately caused Anadith's death.

200. The United States owed a heightened legal duty to supervise its agents and medical personnel who provided care for Anadith. The United States failed in its legal duty by providing inadequate supervision of its own employees, officers, and agents.

201. The United States' failure to adequately supervise its own employees, officers, and agents resulted in the severe physical pain, suffering, inhumane treatment, and ultimate death of Anadith.

202. The United States violated mandatory, non-discretionary agency obligations.

203. The United States' non-compliance with its internal policies and state and federal law constitutes a breach of duty to supervise its agents and medical personnel.

204. The United States' supervisory officials were fully aware of the squalid, overcrowded, and dangerous conditions in CBP holding facilities, the risk of infectious disease and sepsis due to those conditions, and the failure to provide adequate medical care in those facilities—especially for children—all of which have been well-documented in the press, reports, and litigation.

205. Supervisors were, or should have been, aware that their supervision practices were inadequate by the time Anadith was detained in May 2023 based on the deaths of numerous children from preventable diseases in CBP custody or shortly after transfer from CBP facilities.

206. The United States directly supervised the operations of medical personnel at the Donna Processing Center and the Harlingen Border Patrol Station and permitted egregious violations of the United States' detention policies. The

United States was negligent in failing to correct repeated policy violations and systemic failures.

207. The United States' negligent supervision was a substantial factor in bringing about Anadith's death, and Anadith's death would not have occurred but for the United States' negligence.

208. Had the medical personnel or agents been properly supervised and listened to Anadith and Ms. Alvarez Benedicks, consulted an on-call physician, or called for emergency services, her death would have been prevented.

209. The United States knew that its agents and medical personnel were inadequately supervising both the conditions in its facilities and the medical treatment of children in custody, including Anadith, creating a foreseeable risk of serious harm to Anadith.

210. The United States knew that its medical personnel were chronically understaffed and at times operating without any scheduled medical provider, resulting in the foreseeable risk of Anadith's death.

211. The actions of the United States' supervisory employees constituted negligent supervision under state and federal law.

212. Had she lived, Anadith would have been entitled to bring an action against the United States for the injuries it inflicted on her.

213. As a direct and proximate result of the United States' negligent conduct, Anadith's parents, Ms. Mabel Estanislada Alvarez Benedicks and Mr. Rossel Doney Reyes Martinez, suffered extreme mental and emotional pain and distress, as well as loss of companionship, support, enjoyment of life, and other benefits that would have been provided by Anadith.

**FIFTH CAUSE OF ACTION AGAINST THE UNITED STATES**
**(Texas Survival Statute: Negligent Training)**
**(Tex. Civ. Prac. & Rem. Code § 71.021)**
**(Asserted Through the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1))**

214. Plaintiffs repeat and restate each of the above allegations.

215. Plaintiffs are the surviving parents of Anadith. Plaintiffs Ms. Alvarez Benedicks and Mr. Reyes Martinez bring this action in their capacity as heirs and legal representatives of the Estate under the Texas Survival Statute. TEX. CIV. PRAC. & REM. CODE § 71.021.

216. The United States has a duty to properly train other employees, officers, and agents.

217. The United States' negligent training proximately caused Anadith's death.

218. The United States owed a heightened legal duty to train its agents and medical personnel who provided care for Anadith. Defendant failed in its legal duty by providing inadequate training of its own employees, officers, and agents.

219. The United States' failure to adequately train its own employees, officers, and agents resulted in the severe physical pain, suffering, inhumane treatment, and ultimate death of Anadith.

220. The United States violated mandatory, non-discretionary agency obligations.

221. The United States' non-compliance with its internal policies and Texas and federal law constitutes a breach of its duty to train its agents and medical personnel.

222. The United States was fully aware of the squalid, overcrowded, and dangerous conditions in CBP holding facilities, the risk of infectious disease and sepsis due to those conditions, and the failure to provide adequate medical care in those facilities—especially for children—all of which have been well-documented in the press, reports, and litigation.

223. Supervisors were, or should have been, aware that their supervision and training practices were inadequate by the time Anadith was detained in May 2023 based on the deaths of numerous children from preventable diseases in CBP custody or shortly after transfer from CBP facilities.

224. The United States was responsible for ensuring the training of medical personnel at the Donna Processing Center and the Harlingen Border Patrol Station.

The United States was negligent in failing to provide appropriate training, resulting in numerous policy violations and systemic failures.

225. The United States' negligent training was a substantial factor in bringing about Anadith's death, and Anadith's death would not have occurred but for the United States' negligence.

226. Had the medical personnel or agents been properly trained and listened to Anadith and Ms. Alvarez Benedicks, consulted an on-call physician, or called for emergency services, her death would have been prevented.

227. The United States knew that its agents and LSGS medical personnel were inadequately trained, creating a foreseeable risk of serious harm to Anadith.

228. The United States' actions constituted negligent training under Texas and federal law.

229. Had she lived, Anadith would have been entitled to bring an action against the United States for the injuries it inflicted on her.

230. As a direct and proximate result of the United States' negligent conduct, Anadith's parents, Ms. Mabel Estanislada Alvarez Benedicks and Mr. Rossel Doney Reyes Martinez, suffered extreme mental and emotional pain and distress, as well as loss of companionship, support, enjoyment of life, and other benefits that would have been provided by Anadith.

## <u>SIXTH CAUSE OF ACTION AGAINST THE UNITED STATES</u>
## (Texas Survival Statute: Intentional Infliction of Emotional Distress)
## (Tex. Civ. Prac. & Rem. Code § 71.021)
## (Asserted Through the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1))

231. Plaintiffs repeat and restate each of the above allegations.

232. Plaintiffs are the surviving parents of Anadith. Plaintiffs Ms. Alvarez Benedicks and Mr. Reyes Martinez bring this action in their capacity as heirs and legal representatives of the Estate under the Texas Survival Statute. TEX. CIV. PRAC. & REM. CODE § 71.021.

233. The United States acted intentionally or recklessly by at least (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to upgrade Anadith to a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately train CBP officers, employees, and agents.

234. The United States also failed to appropriately train its employees, officers, and agents and failed to adequately staff its facilities with the personnel required to provide adequate care.

235. The United States' employees, officers, and agents repeatedly dismissed both Anadith and Ms. Alvarez Benedicks's pleas for help, claiming that Anadith was exhibiting symptoms of a less serious illness.

236. One agent told Anadith and Ms. Alvarez Benedicks that because Anadith had not passed out, she was not, in fact, struggling to breathe.

237. The United States' conduct was extreme and outrageous, causing Anadith and her family to experience severe emotional distress.

238. Had she lived, Anadith would have been entitled to bring an action against the United States for the injuries it inflicted on her.

239. As a direct and proximate result of the United States' conduct, Anadith's parents, Ms. Mabel Estanislada Alvarez Benedicks and Mr. Rossel Doney Reyes Martinez, suffered extreme mental and emotional pain and distress, as well as loss of companionship, support, enjoyment of life, and other benefits that would have been provided by Anadith.

**SEVENTH CAUSE OF ACTION AGAINST THE UNITED STATES**
**(Intentional Infliction of Emotional Distress on Behalf of Plaintiff Mabel Estanislada Alvarez Benedicks)**
**(Asserted Through the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1))**

240. Plaintiffs repeat and restate each of the above allegations.

241. Plaintiff Mabel Estanislada Alvarez Benedicks is the surviving mother of Anadith.

242. The United States acted intentionally or recklessly by at least (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to upgrade Anadith to a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately train CBP officers, employees, and agents.

243. The United States failed to prevent Ms. Alvarez Benedicks—who was at the scene—from witnessing Anadith's death.

244. The United States' employees, officers, and agents repeatedly dismissed both Anadith and Ms. Alvarez Benedicks's pleas for help, claiming that Anadith was exhibiting symptoms of a less serious illness.

245. One agent even told Anadith and Ms. Alvarez Benedicks that because Anadith had not passed out, she was not, in fact, struggling to breathe. After CBP and LSGS personnel repeatedly dismissed and ignored Ms. Alvarez Benedicks, she was forced to witness Anadith die in her arms. Further, CBP did not even allow her to ride in the ambulance with Anadith to the hospital.

246. The United States' conduct was extreme and outrageous, and as a direct and proximate result of that conduct, Ms. Alvarez Benedicks experienced shock and severe emotional pain and distress from witnessing Anadith's death. Anadith's death traumatized Ms. Alvarez Benedicks, and she continues to experience depression, anxiety, and sleep disturbances. She also sought mental health treatment, attends medical appointments every two weeks, and is currently taking medication.

247. No alternative cause of action would provide a remedy for the severe emotional distress caused by the United States.

**EIGHTH CAUSE OF ACTION AGAINST THE UNITED STATES**
**(Bystander Injury on Behalf of**
**Plaintiff Mabel Estanislada Alvarez Benedicks)**
**(Asserted Through the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1))**

248. Plaintiff repeats and restates each of the above allegations.

249. Plaintiff Mabel Estanislada Alvarez Benedicks is the surviving mother of Anadith.

250. The United States breached its duties and acted intentionally or recklessly by at least (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to upgrade Anadith to a higher level of medical care or transfer her to a local health facility, even as her condition

deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately train CBP officers, employees, and agents.

251. The United States failed to prevent Ms. Alvarez Benedicks—who was at the scene—from witnessing Anadith's death.

252. The United States' employees, officers, and agents repeatedly dismissed both Anadith and Ms. Alvarez Benedicks's pleas for help, claiming that Anadith was exhibiting symptoms of a less serious illness.

253. One agent even told Anadith and Ms. Alvarez Benedicks that because Anadith had not passed out, she was not, in fact, struggling to breathe. After the United States repeatedly dismissed and ignored Ms. Alvarez Benedicks, she was forced to witness Anadith die in her arms. Further, CBP did not even allow her to ride in the ambulance with Anadith to the hospital.

254. The United States' conduct was extreme and outrageous, and as a direct and proximate result of that conduct, Ms. Alvarez Benedicks experienced shock and severe emotional pain and distress from witnessing Anadith's death. Anadith's death traumatized Ms. Alvarez Benedicks, and she continues to experience depression, anxiety, and sleep disturbances. She also sought mental health treatment, attends medical appointments every two weeks, and is currently taking medication.

**<u>NINTH CAUSE OF ACTION AGAINST THE UNITED STATES</u>**
**(Intentional Infliction of Emotional Distress on Behalf of Plaintiff Rossel Doney Reyes Martinez)**
**(Asserted Through the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1))**

255. Plaintiff repeats and restates each of the above allegations.

256. Plaintiff Rossel Doney Reyes Martinez is the surviving father of Anadith.

257. The United States acted intentionally or recklessly by at least (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to upgrade Anadith to a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately train CBP officers, employees, and agents.

258. The United States failed to prevent Mr. Reyes Martinez—who was at the scene—from witnessing Anadith's death. CBP separated Anadith's father, Mr. Reyes Martinez, from Ms. Alvarez Benedicks and Anadith. Unable to intervene or assist from his housing cell, he was helpless as he saw Anadith go limp and die in her mother's arms.

259. The United States' conduct was extreme and outrageous, and as a direct and proximate result of that conduct, Mr. Reyes Martinez experienced shock and severe emotional pain and distress from witnessing Anadith's death. Anadith's death traumatized Mr. Reyes Martinez, and he continues to experience depression, anxiety, and sleep disturbances.

260. No alternative cause of action would provide a remedy for the severe emotional distress caused by the United States.

**TENTH CAUSE OF ACTION AGAINST THE UNITED STATES**
**(Bystander Injury on Behalf of Plaintiff Rossel Doney Reyes Martinez)**
**(Asserted Through the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1))**

261. Plaintiff repeats and restates each of the above allegations.

262. Plaintiff Rossel Doney Reyes Martinez is the surviving father of Anadith.

263. The United States breached its duties and acted intentionally or recklessly by at least (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to upgrade Anadith to a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help,

especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately train CBP officers, employees, and agents.

264. The United States failed to prevent Mr. Reyes Martinez—who was at the scene—from witnessing Anadith's death. CBP separated Anadith's father, Mr. Reyes Martinez, from Ms. Alvarez Benedicks and Anadith. Unable to intervene or assist from his housing cell, he was helpless as he saw Anadith go limp and die in her mother's arms.

265. The United States' conduct was extreme and outrageous, and as a direct and proximate result of that conduct, Mr. Reyes Martinez experienced shock and severe emotional pain and distress from witnessing Anadith's death. Anadith's death traumatized Mr. Reyes Martinez, and he continues to experience depression, anxiety, and sleep disturbances.

**<u>ELEVENTH CAUSE OF ACTION AGAINST THE UNITED STATES</u>**
**(Texas Wrongful Death Act: Negligence, Gross Negligence, Negligent Undertaking, Negligent Training, Negligent Supervision)**
**(Tex. Civ. Prac. Rem. Code § 71.002, *et seq*.)**
**(Asserted Through the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1))**

266. Plaintiffs repeat and restate each of the above allegations.

267. Plaintiffs are the surviving parents of Anadith. Plaintiffs Ms. Alvarez Benedicks and Mr. Reyes Martinez bring this action for the benefit of all beneficiaries entitled to recover under the Texas Wrongful Death Act, by reason of Anadith's death. *See* TEX. CIV. PRAC. & REM. CODE § 71.001, *et seq.* Plaintiffs sue

in their capacity as wrongful death beneficiaries and legal representatives of Estate of Anadith. *See id.* § 71.004.

268. Anadith's death was directly caused by the United States' wrongful act, neglect, carelessness, unskillfulness, or default. *See id.* § 71.002(b).

269. The United States was directly responsible for Anadith's health and safety while in custody. The United States owed a duty to provide reasonable care to detainees, including Anadith, and to ensure that the medical care administered adhered to the standards of pediatric medical care and obligations under TEDS and the *Flores* agreement. The United States owed a duty to exercise reasonable care to avoid a foreseeable risk of injury to Anadith.

270. The United States breached its nondiscretionary duties in at least six ways: (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to upgrade Anadith to a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately train CBP officers, employees, and agents.

271. Through its numerous failures outlined above, the United States' employees, officers, and agents drastically increased the risk of harm to Anadith, causing her death.

272. Any reasonable person, especially a reasonable healthcare provider, would have foreseen that failing to treat a critically ill child with sickle cell anemia and chronic heart disease would lead to further injury or death.

273. As a direct and proximate result of the United States' negligent conduct, Anadith's parents, Ms. Alvarez Benedicks and Mr. Reyes Martinez, suffered extreme mental and emotional pain and distress, as well as loss of companionship, support, enjoyment of life, and other benefits that would have been provided by Anadith.

274. Anadith would have been entitled to bring an action against the United States for the injuries inflicted on her if she had lived.

**TWELFTH CAUSE OF ACTION AGAINST LSGS**
**(Texas Survival Statute: Negligence)**
**(Tex. Civ. Prac. & Rem. Code § 71.021)**

275. Plaintiffs repeat and restate each of the above allegations.

276. Plaintiffs are the surviving parents of Anadith. Plaintiffs Ms. Alvarez Benedicks and Mr. Reyes Martinez bring this action in their capacity as heirs and legal representatives of the Estate under the Texas Survival Statute. TEX. CIV. PRAC. & REM. CODE § 71.021.

277. LSGS's employees, as Anadith's medical providers, owed a duty to Anadith to exercise reasonable care and ordinary prudence when providing medical services.

278. LSGS breached this duty by at least (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to provide Anadith with a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately supervise and train its employees.

279. By failing to provide necessary medical care, LSGS increased the risk of harm to Anadith, ultimately causing her death. A reasonable healthcare provider would have foreseen that failing to treat a critically ill child with sickle cell anemia and chronic heart disease would lead to further injury or death.

280. As a direct and proximate result of LSGS's negligent conduct, Anadith suffered injuries and death.

**THIRTEENTH CAUSE OF ACTION AGAINST LSGS**
**(Texas Survival Statute: Gross Negligence)**
**(Tex. Civ. Prac. & Rem. Code § 71.021)**

281. Plaintiffs repeat and restate each of the above allegations.

282. Plaintiffs are the surviving parents of Anadith. Plaintiffs Ms. Alvarez Benedicks and Mr. Reyes Martinez bring this action in their capacity as heirs and legal representatives of the Estate under the Texas Survival Statute. Tex. Civ. Prac. Rem. Code § 71.021.

283. LSGS's employees, as Anadith's medical providers, owed a duty to Anadith to exercise reasonable care and ordinary prudence when providing medical services.

284. LSGS breached this duty by at least (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to provide Anadith with a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately supervise and train its employees.

285. LSGS also failed to appropriately train its employees, officers, and agents and adequately staff its facilities with the personnel required to provide adequate care, especially to vulnerable and at-risk pediatric patients.

286. Through its numerous failures outlined above, LSGS drastically increased the risk of harm to Anadith, causing her death.

287. The actions of LSGS involved an extreme degree of risk considering the probability and magnitude of the harm it could, and did, cause Anadith.

288. Any reasonable person, especially a reasonable healthcare provider, would have foreseen that failing to treat a critically ill child with sickle cell anemia and chronic heart disease—including once she was acutely ill with a fever and having trouble breathing—would lead to further injury or death.

289. LSGS knew that people under its care would have special vulnerabilities to serious injuries and death because of disabilities and preexisting medical conditions. LSGS nevertheless did not train its employees or establish systems to document those disabilities and medical conditions and assess the risk of serious harm or complications, including by requiring physician consultation and oversight of employees working in the detention centers.

290. LSGS had actual, subjective awareness of the risks involved, but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others.

291. As a direct and proximate result of LSGS's grossly negligent, reckless, and deliberately indifferent conduct, Anadith suffered extreme and extended physical, mental, and emotional pain, distress, and death.

292. Had she lived, Anadith would have been entitled to bring an action against LSGS for the injuries it inflicted on her.

293. As a direct and proximate result of LSGS's grossly negligent, reckless, and deliberately indifferent conduct, Anadith's parents, Ms. Mabel Estanislada Alvarez Benedicks and Mr. Rossel Doney Reyes Martinez, suffered extreme mental and emotional pain and distress, as well as loss of companionship, support, enjoyment of life, and other benefits that would have been provided by Anadith.

**FOURTEENTH CAUSE OF ACTION AGAINST LSGS**
**(Texas Survival Statute: Negligent Supervision and Training)**
**(Tex. Civ. Prac. & Rem. Code § 71.021)**

294. Plaintiffs repeat and restate each of the above allegations.

295. Plaintiffs are the surviving parents of Anadith. Plaintiffs Ms. Alvarez Benedicks and Mr. Reyes Martinez bring this action in their capacity as heirs and legal representatives of the Estate under the Texas Survival Statute. TEX. CIV. PRAC. & REM. CODE § 71.021.

296. LSGS owed a duty to prevent harm by properly supervising and training its employees, who administer medical services.

297. LSGS knew that people under its care would have special vulnerabilities to serious injuries and death because of disabilities and preexisting medical conditions. LSGS nevertheless did not adequately supervise and train its employees or establish systems to document those disabilities and medical conditions and assess the risk of serious harm or complications, including by requiring physician consultation and oversight of employees working in the detention centers. By doing so, LSGS acted with conscious indifference to the rights, safety, and welfare of individuals like Anadith.

298. LSGS's failure to properly supervise and train its employees and ensure they were administering proper medical care, especially to vulnerable and at-risk pediatric patients, was negligent and grossly negligent, and it was the proximate cause of Anadith's preventable death.

**FIFTEENTH CAUSE OF ACTION AGAINST LSGS**
**(Texas Survival Statute: Medical Malpractice)**
**(Asserted under the Texas Medical Liability Act)**
**(Tex. Civ. Prac. Rem. Code §§ 71.021, 74.151, 74.153)**

299. Plaintiffs repeat and restate each of the above allegations.

300. In the alternative to Causes of Action 12-14, LSGS is liable for Medical Malpractice. LSGS is a "healthcare provider" under the Texas Medical Liability Act ("TMLA") if it has a license to practice medicine in Texas. TEX. CIV. PRAC. & REM. CODE § 74.001(a)(12).

301. Plaintiffs are the surviving parents of Anadith. Plaintiffs Ms. Alvarez Benedicks and Mr. Reyes Martinez bring this action in their capacity as heirs and legal representatives of the Estate under the Texas Survival Statute. TEX. CIV. PRAC. & REM. CODE § 71.021.

302. LSGS's negligent care—including the failure to consult with an on-call physician, decisions to only administer minor medications and dismiss Anadith's severe symptoms, and refusal to transfer Anadith to a hospital—proximately caused Anadith's deterioration and death.

**SIXTEENTH CAUSE OF ACTION AGAINST LSGS**
**(Texas Survival Statute: Intentional Infliction of Emotional Distress)**
**(Tex. Civ. Prac. & Rem. Code § 71.021)**

303. Plaintiffs repeat and restate each of the above allegations.

304. Plaintiffs are the surviving parents of Anadith. Plaintiffs Ms. Alvarez Benedicks and Mr. Reyes Martinez bring this action in their capacity as heirs and legal representatives of the Estate under the Texas Survival Statute. TEX. CIV. PRAC. & REM. CODE § 71.021.

305. LSGS acted recklessly or intentionally by at least (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately categorize Anadith as at-risk and require additional monitoring; (4)

repeatedly refusing to provide Anadith with a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately supervise and train its employees.

306. LSGS repeatedly dismissed both Anadith and Ms. Alvarez Benedicks's pleas for help, claiming that Anadith was exhibiting symptoms of a less serious illness.

307. LSGS's conduct was extreme and outrageous, causing Anadith and her family to experience severe emotional distress.

308. Had she lived, Anadith would have been entitled to bring an action against LSGS for the injuries it inflicted on her.

309. As a direct and proximate result of LSGS's conduct, Anadith's parents, Ms. Mabel Estanislada Alvarez Benedicks and Mr. Rossel Doney Reyes Martinez, suffered extreme mental and emotional pain and distress, as well as loss of companionship, support, enjoyment of life, and other benefits that would have been provided by Anadith.

**<u>SEVENTEENTH CAUSE OF ACTION AGAINST LSGS</u>**
**(Intentional Infliction of Emotional Distress on Behalf of Plaintiff Mabel Estanislada Alvarez Benedicks)**

310. Plaintiff repeats and restates each of the above allegations.

311. Plaintiff Mabel Estanislada Alvarez Benedicks is the surviving mother of Anadith.

312. LSGS acted recklessly or intentionally by at least (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to provide Anadith with a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately supervise and train its employees.

313. LSGS's employees, officers, and agents repeatedly dismissed both Anadith and Ms. Alvarez Benedicks's pleas for help, claiming that Anadith was exhibiting symptoms of a less serious illness.

314. LSGS's conduct was extreme and outrageous, and as a direct and proximate result of that conduct, Ms. Alvarez Benedicks experienced shock and severe emotional pain and distress from witnessing Anadith's death. Anadith's death traumatized Ms. Alvarez Benedicks, and she continues to experience depression,

anxiety, and sleep disturbances. She also sought mental health treatment, attends medical appointments every two weeks, and is currently taking medication.

315. No alternative cause of action would provide a remedy for the severe emotional distress caused by LSGS.

**EIGHTEENTH CAUSE OF ACTION AGAINST LSGS**
**(Bystander Injury on Behalf of**
**Plaintiff Mabel Estanislada Alvarez Benedicks)**

316. Plaintiff repeats and restates each of the above allegations.

317. Plaintiff Mabel Estanislada Alvarez Benedicks is the surviving mother of Anadith.

318. LSGS acted recklessly or intentionally by at least (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to provide Anadith with a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately supervise and train its employees.

319. LSGS's employees, officers, and agents repeatedly dismissed both Anadith and Ms. Alvarez Benedicks's pleas for help, claiming that Anadith was exhibiting symptoms of a less serious illness.

320. LSGS's conduct was extreme and outrageous, and as a direct and proximate result of that conduct, Ms. Alvarez Benedicks experienced shock and severe emotional pain and distress from witnessing Anadith's death. Anadith's death traumatized Ms. Alvarez Benedicks, and she continues to experience depression, anxiety, and sleep disturbances. She also sought mental health treatment, attends medical appointments every two weeks, and is currently taking medication.

**NINETEENTH CAUSE OF ACTION AGAINST LSGS**
**(Intentional Infliction of Emotional Distress on Behalf of Plaintiff Rossel Doney Reyes Martinez)**

321. Plaintiff repeats and restates each of the above allegations.

322. Plaintiff Rossel Doney Reyes Martinez is the surviving father of Anadith.

323. LSGS acted recklessly or intentionally by at least (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to provide Anadith with a higher level of medical care or transfer

her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately supervise and train its employees.

324. LSGS's conduct was extreme and outrageous, and as a direct and proximate result of that conduct, Mr. Reyes Martinez experienced shock and severe emotional pain and distress from Anadith's death. Anadith's death traumatized Mr. Reyes Martinez, and he continues to experience depression, anxiety, and sleep disturbances.

325. No alternative cause of action would provide a remedy for the severe emotional distress caused by LSGS.

**TWENTIETH CAUSE OF ACTION AGAINST LSGS**
**(Bystander Injury on Behalf of**
**Plaintiff Rossel Doney Reyes Martinez)**

326. Plaintiff repeats and restates each of the above allegations.

327. Plaintiff Rossel Doney Reyes Martinez is the surviving father of Anadith.

328. LSGS acted recklessly or intentionally by at least (1) failing to provide Anadith with medical treatment that met the applicable standard of care; (2) failing to consult an on-call physician regarding Anadith's high-risk status as a pediatric patient with severe chronic health conditions and influenza; (3) failing to

appropriately categorize Anadith as at-risk and require additional monitoring; (4) repeatedly refusing to provide Anadith with a higher level of medical care or transfer her to a local health facility, even as her condition deteriorated; (5) ignoring Anadith's and her mother's multiple pleas for help, especially as her needs escalated to the level of a medical emergency; and (6) failing to appropriately supervise and train its employees.

329. LSGS's employees, officers, and agents repeatedly dismissed both Anadith and Ms. Alvarez Benedicks's pleas for help, claiming that Anadith was exhibiting symptoms of a less serious illness.

330. LSGS's conduct was extreme and outrageous, and as a direct and proximate result of that conduct, Mr. Reyes Martinez experienced shock and severe emotional pain and distress from Anadith's death. Anadith's death traumatized Mr. Reyes Martinez, and he continues to experience depression, anxiety, and sleep disturbances.

## **PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiffs respectfully request that this Court:

i. Award Plaintiffs actual damages, including economic and noneconomic damages, direct and consequential damages, and damages for mental anguish, past and future pain and suffering, pecuniary loss, loss of companionship and society, loss of household

services, loss of inheritance, funeral expenses, pain and suffering and mental anguish of the decedent, and medical expenses; and

ii. Jury Demand as to state tort claims against LSGS.

iii. Exemplary and punitive damages;

iv. Costs of court;

v. Pre-judgment and Post-judgment interest;

vi. Attorneys' fees and costs; and

vii. All other relief, in law or in equity, as the Court deems just and appropriate.

**Dated: August 31, 2026**

Respectfully submitted,

/s/ *Gloria Park*
Stephen Shackelford, Jr.
New York State Bar No. 5393657
SDNY No. SS3310
Gloria Park
New York State Bar No. 5477047
SDNY No. GP0913
One Manhattan West
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sshackelford@susmangodfrey.com
gpark@susmangodfrey.com

Neal Manne
Texas State Bar No. 12937980
Shawn Raymond
Texas State Bar No. 24009236
Elizabeth Hadaway
Texas State Bar No. 24109962

Armando Lozano
New York State Bar No. 5749833
Texas State Bar No. 24120467
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
nmanne@susmangodfrey.com
sraymond@susmangodfrey.com
ehadaway@susmangodfrey.com
alozano@susmangodfrey.com

Katherine M. Peaslee
Washington State Bar No. 52881
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
kpeaslee@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**

Kassandra Gonzalez
Texas Bar No. 24116439
Kate Gibson Kumar
Texas Bar No. 24137588
Alana Park
Texas Bar No. 24150568
**TEXAS CIVIL RIGHTS PROJECT**
P.O. Box 17757
Austin, Texas 78760
(512) 474-5073 ext. 225
(512) 474-0726 (fax)
kassandra@texascivilrightsproject.org
kate@texascivilrightsproject.org
alana@texascivilrightsproject.org

Daniel Hatoum
Texas Bar No. 24099136
**TEXAS CIVIL RIGHTS PROJECT**
P.O. Box 219

Alamo, Texas 78516
(965) 787-8171 ext. 208
(956) 787-6348
daniel@texascivilrightsproject.org

Erik Crew*
New York Bar No. 587991
**HAITIAN BRIDGE ALLIANCE**
4560 Alvarado Canyon Road
Suite 1H
San Diego, CA 92120
(949) 603-7411
ecrew@haitianbridge.org

Sara Zampierin*
Texas Bar No. 24132896
Kaya Mason**
Abbiee Pierce**
**CIVIL RIGHTS CLINIC, TEXAS A&M SCHOOL OF LAW*****
1515 Commerce St.
Fort Worth, TX 76102
Phone: (817) 212-4127
Sara.zampierin@law.tamu.edu

*Attorneys for Plaintiffs Mabel Estanislada Alvarez Benedicks and Rossel Doney Reyes Martinez*

*Application for *Pro Hac Vice* forthcoming
** Motion for Law Student Appearance Forthcoming
*** Plaintiff is represented by a clinic operated by Texas A&M University School of Law, but this document does not purport to present the school's institutional views, if any.